Richard D. Burbidge (#0492)
Stephen B. Mitchell (#2278)
Jefferson W. Gross (#8339)
BURBIDGE & MITCHELL
215 South State, Suite 920
Salt Lake City, Utah 84111
Phone: (801) 355-6677
Fax: (801) 355-2341

Bryan G. Harrison
MORRIS, MANNING & MARTIN, L.L.P.
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000

Chad D. Tillman
TILLMAN LAW OFFICE, PLLC
6510 Patchwork Circle
Charlotte, North Carolina 28270
(704) 458-2423

Attorneys for Defendant
Columbia Data Products, Inc.

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| EMC CORPORATION, | ) | **MEMORANDUM IN SUPPORT OF DEFENDANT COLUMBIA DATA PRODUCTS, INC.'S MOTION *IN LIMINE* TO PRECLUDE OR, IN THE ALTERNATIVE, TO LIMIT LANCE E. GUNDERSON'S TESTIMONY REGARDING REASONABLE ROYALTY DAMAGES** |
| Plaintiff, | ) | |
| v. | ) | |
| COLUMBIA DATA PRODUCTS, INC., | ) | |
| Defendant. | ) | Civil No. 2:01CV00312C<br>The Honorable Tena Campbell<br>Magistrate Sam Alba |

FILED
CLERK U.S. DISTRICT COURT
2004 JUL 27 P 4:58
ORIGINAL
DISTRICT OF UTAH
DEPUTY CLERK

306

Defendant Columbia Data Products, Inc. ("CDP"), submits the following Memorandum in Support of its Motion to Preclude or, in the alternative, to Limit Lance E. Gunderson's ("Gunderson") Expert Testimony Concerning Reasonable Royalty Damages of Plaintiff EMC Corporation ("EMC").

## I.

## INTRODUCTION

In this case, EMC does not claim "lost profits" as damages for the patent infringement alleged by it. Instead, pursuant to 35 U.S.C. § 284, EMC seeks a "reasonable royalty" as patent infringement damages.

While the fixing of a "reasonable royalty" certainly lacks analytical precision according to the factors to be considered as set forth in *Georgia-Pacific Corporation v. United States Plywood Corp.*, 381 F. Supp. 111 (S. D. N. Y. 1970), the Federal Circuit has placed parameters on what may be properly considered in evaluating reasonable royalty damages. Likewise, the Federal Circuit has endorsed scrutiny of expert opinions on reasonable royalty damages under the rubric of Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S., 137, 119 S. Ct. 1167 (1999).

2

Lance E. Gunderson is EMC's retained expert on damages. Gunderson's opinions concerning reasonable royalty damages are inadmissible because he has abjectly ignored application of the *Georgia Pacific* factors as further defined by guiding Federal Circuit opinions. For the reasons that follow, Gunderson should be precluded from opining on reasonable royalty damages or, in the alternative, should be precluded from testifying on some of his alleged bases for his reasonable royalty.

## II.

## FACTUAL BACKGROUND

*Gunderson's Report on Damages.*

1. On April 2, 2004, EMC provided the expert witness disclosure of Gunderson, together with his expert report.[1] (Gunderson Depo., Exhibit "1" thereto (the "Report".) The Report concerns EMC's alleged damages in this case.

2. Gunderson concludes that "the appropriate royalty rate to be applied in this case ranges from 12% to 15% of CDP's allegedly infringing net sales revenue." (Report at p. 22.) Based on CDP's revenue for its OTM and PSM products, Gunderson therefore opines that the appropriate amount of damages "range from approximately $3.4 million to $4.2 million." (*Id.* at p. 23.)

---

[1] The relevant portions of Gunderson's deposition and his April 2, 2004 report is attached as Exhibit "A" hereto.

***Gunderson's "Reasonable Royalty" Rate is Simply a Profit Split.***

3.      Gunderson's reasonable royalty analysis used a rate of "25% to 33% of profits. . . as a starting point in [his] royalty rate analysis." (Report at p. 12.) According to Gunderson, he obtained this "range" from "several articles. . . . There's a guy named Goldscheider who kind of started it." (Gunderson Depo. at p. 128:12-128:19.)

4.      Gunderson used this range of "25% to 33% of profits" as not only the "starting point", but also as the "ending point" of his analysis. (Gunderson Depo. at pp. 128:23-129:4.) In his own words, Gunderson described this rate as follows:

> Q.   So is that basically just a percentage of the profits?
>
> A.   It's a profit split. It's a split of operating profits.
>
> Q.   So if the profit margin goes up or down, obviously the reasonable royalty based on this range that you describe would be affected?
>
> A.   If the operating profit goes up then it would go up and if it went down it would go down, yes.

(Gunderson Depo. at p. 129:5-129:14.)

5.      In his report, Gunderson explained that his profit split factored into his opinions about a range of a reasonable royalty rate as follows:

> As such a 25% to 33% operating profit split is appropriate and would yield a royalty range of approximately 12% to 15%.
> (Report at p. 15.)

4

***Gunderson's "Hypothetical Negotiation" is an After the Fact Assessment.***

6.   In his report, Gunderson acknowledges that "the hypothetical negotiation between CDP and Vinca would have taken place in mid-1997." (Report at p. 22.)

7.   In analyzing this "hypothetical negotiation", Gunderson's analysis is not limited in any respect to the information known or reasonably foreseeable to the parties at the time of the hypothetical negotiation.[2] In particular, Gunderson testified that his analysis <u>was not limited</u> to those facts known or available to the parties at the time of the hypothetical negotiation as follows:

> Q.   I understand that. And you would testify that time frame is somewhat important as you go through this reasonable royalty analysis, isn't it?
>
> A.   I would say – and I see you're hung up on the time frame. I would say that you should <u>consider everything before and after</u> the hypothetical negotiation, you should consider information that happens afterwards as well.

(Gunderson Depo. at pp. 45:21-46:3, emphasis added.)

8.   Gunderson further testified that he employed <u>no objective standard</u> in determining whether events subsequent to 1997 should be considered for purposes of the hypothetical negotiation as follows:

---

[2] About the only significant event which occurred after 1997 which Gunderson claims should not be considered in evaluating a reasonable royalty is Legato's (EMC's) license agreement with Microsoft. (Report at pp. 8-11.) This royalty-free license agreement was presumably excluded by Gunderson in his analysis because a "free" license agreement is perhaps inconsistent with EMC's claim for millions of dollars in damages.

5

> Q. And so if I'm looking forward to events that happened subsequent to 1997, is there some objective test that you apply to those events to determine whether or not you are going to incorporate those subsequent events in your analysis of a reasonable royalty?
>
> A. I think it's really – it's <u>more of a subjective test</u>. It's the determination of the person doing the analysis tried to determine what is relevant and what is not relevant. For example, in this case I use an example of profitability. In this case, as I understand it, <u>there's no profitability for this specific product at the time</u> and so using the actual profitability of their product is very important. That's an extremely important element that occurs after the hypothetical. I give that strong weight, and that's a place that Mr. Hoffman and I obviously disagree on. But <u>it's, I guess, up to the person doing the analysis to determine which things they consider and which things they don't consider and why</u>.
>
> \* \* \*
>
> Q. Would you want to consider events at the time of the hypothetical negotiation for purposes of determining a reasonable royalty that <u>were not foreseeable</u>?
>
> A. I think you consider events that – you know, <u>whether they're foreseeable or not, I think you consider the totality of the evidence</u>. You consider all of the facts in the case.

(Gunderson Depo. at pp. 53:5-54:1, 54:19-55:1, emphasis added.)

9.  Accordingly, Gunderson's analysis about a hypothetical negotiation would not, by his own testimony, be affected by the parties' expectations at the time of the hypothetical negotiation. For example, Gunderson testified that if the parties anticipated

6

a much lower profit margin than that experienced by CDP (47%), his opinions on a reasonable royalty would be unaffected. (Gunderson Depo. at p. 124:4-124:13.) Likewise, while Gunderson considered valuations of CDP three years after this hypothetical negotiation (Report at pp. 15-17), Gunderson acknowledged there was no evidence whatsoever that the parties could have anticipated CDP having such valuations at the time of the hypothetical negotiation. (Gunderson Depo. at p. 133:1-133:13.) While Gunderson considered CDP's <u>estimates</u> that the market for storage management software in 2006 would be $15.2 billion, Gunderson acknowledged that he was unaware of any evidence, at the time of the hypothetical negotiation, that the parties anticipated a market as large as $1 billion per year. (*Id.* at 133:17-133:25.)

***Use of "Industry Licenses"***.

10.  In his report, Gunderson states that "[n]either party to this suit has established licensing policies or existing license agreements for the patents-in-suit or patents outside of this dispute." Accordingly, in evaluating the *Georgia Pacific* factors, Gunderson concludes that the parties' licensing practices do not assist in establishing a reasonably royalty. (Report at pp. 11-12.)

11.  However, Gunderson opines that "publicly available licensing information shows many software licenses having a royalty rate between 10% and 20%" – which,

7

unsurprisingly, is within the "reasonable royalty" rate suggested by Gunderson. (Report at pp. 12, 22.)

12. In his Report, Gunderson summarized his findings about "industry licensing" as follows:

> I have reviewed publicly available licenses in the software industry. The publicly available licenses I reviewed vary widely from as high as <u>65% to less than 1%. Many are found</u> in the 10% to 20% range. (Report at p. 11, emphasis added.)

13. At his deposition, Gunderson acknowledged that he was unable to find any "industry" license agreements which concerned comparable technology to that described in the patents-in-suit. (Gunderson Depo. at pp. 36:5-37:2, 39:15-39:22.).

14. Gunderson also acknowledged that, of the "industry" license agreements which he reviewed, only 20%-30% of those license agreements actually had royalty rates in the range of 10%-20%. (Gunderson Depo. at pp. 122:19-123:8.) Indeed, faced with these numbers, Gunderson acknowledged that, in fact, most of the license agreements which he reviewed <u>were outside</u> of his range of a 10%-20% royalty. (*Id.* at 123:12-123:18.)

***Gunderson's Opinions on Whether Non-Infringing Substitutes are "Acceptable".***

15. In his report and at his deposition, Gunderson acknowledged that non-infringing substitutes existed and exist for the technology claimed by the patents in suit. (Report at p. 21; Gunderson Depo. at p. 71:19-71:25.)

16.  While Gunderson opines that none of these non-infringing substitutes are "acceptable", Gunderson explained his conclusion as follows:

> Q. Right. And maybe I've got it wrong, but as far as your analysis when you're going through and determining whether an alternative is acceptable, is that acceptable to the customers who are going to buy it –
>
> A. No.
>
> Q. – or acceptable to the alleged infringer?
>
> A. No, it's acceptable to the alleged infringer.

(Gunderson Depo. at pp. 102:19-103:2.)

17.  As far as determining whether non-infringing substitutes are acceptable to CDP's customers, Gunderson testified as follows:

> Q. And in order to determine whether or not file-based systems were an acceptable alternative to CDP's customers, Vinca's customers, Legato's customers or any customers in this live back up market, did you do any analysis of the customers?
>
> A. <u>I didn't do any analysis</u>. I mean – [no further response].

(Gunderson Depo. at 74:4-74:9, emphasis added.)[3]

---

[3] At his deposition, Gunderson acknowledged that any reasonable royalty for infringement of the patent could not exceed the amount of money which CDP would have incurred by designing around the patent. (Gunderson Depo. at pp. 92:20-93:23.)

9

## III.

## DISCUSSION

A. **LEGAL STANDARD.**

Fed. R. Evid. 702 provides in pertinent part as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in a form of an opinion of otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Federal Circuit has expressly acknowledged that the court's "gatekeeping duties" under Rule 702 and *Daubert* are applicable to expert witness testimony concerning reasonable royalty damages for patent infringement. *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-1392 (Fed. Cir. 2003) and *Utah Medical Products, Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385 (Fed. Cir. 2003).

In *DSU Medical Corp. v. JMS Co., Ltd.*, 296 F.Supp.2d 1140, 1146-1149 (N. D. Cal. 2003), the court carefully analyzed the "gatekeeper function" under *Daubert* when assessing expert testimony on reasonable royalty damages. In particular, the *DSU Medical* court emphasized that the trial judge should consider "the methodologies relied upon by the expert, not the conclusions reached by the expert." *Id.* at 1147. In evaluating the methodology employed by an expert opining on a reasonable royalty, the *DSU*

*Medical* court emphasized that the "methodology" employed by the expert <u>must comply with the accepted legal standards for opining on a reasonable royalty</u>. *Id.* at 1148. Ultimately, the *DSU Medical* court precluded the plaintiff's damage expert from offering opinions which ran afoul of accepted legal standards for determining a reasonable royalty and acceptable non-infringing substitutes. *Id.* at 1158-1159; *see also, Technology Licensing Corp. v. Gennum Corp.*, 2004 WL 1274391 (N. D. Cal. 2004) (applying *Daubert* to preclude certain opinions about a reasonable royalty).

**B.    GUNDERSON SHOULD BE PRECLUDED, OR CERTAINLY LIMITED, IN HIS TESTIMONY ABOUT A REASONABLE ROYALTY.**

    **1.    Gunderson's "Profit Split" is an Entirely Inappropriate Basis for a Reasonable Royalty.**

As acknowledged by Gunderson, beyond any other considerations he had, the beginning and ending point of his reasonable royalty analysis was picking an arbitrary range for a profit split – which range is not based at all upon any *Georgia Pacific* factors – and applying it to CDP's revenues on the allegedly infringing products.

The Federal Circuit has been quite clear that a reasonable royalty is not based on a profit split but, instead, is grounded upon a hypothetical negotiation at the time the alleged infringement began. For example, in *Radio Steel & Mfg., Co. v. MTD Products, Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986), the court plainly stated as follows:

> The determination of a reasonable royalty, however, <u>is based not on the infringer's profit</u>, but on the royalty to which a

11

>willing licensor and a willing licensee would have agreed at
>the time the infringement began. (Emphasis added.)

In *Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002), the court rejected the plaintiff's expert's theory of damages because it had no fidelity to the hypothetical negotiation concept for determining a reasonably royalty. In particular, the *Riles* Court stated as follows:

>At no time did Riles present evidence that this royalty rate reflected an agreement between Shell and Riles in a hypothetical negotiation. [Citations omitted.] <u>A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment</u>. [Citation omitted.] Clearly, Mr. Dry's models did not reflect what royalty rate a hypothetical negotiation between Shell and Riles would have yielded at the time the infringement began. Instead, <u>the models reflected Mr. Dry's assessment of the worth of Shell's oil rig at the time of the trial</u>. *Id.* (emphasis added).

CDP acknowledges that abandonment of the "hypothetical negotiation" and analysis of the *Georgia Pacific* factors in lieu of a "profit split" would be a much easier determination for experts and juries. However, a "profit split" is simply not the law. Instead, as explained in *Riles* and in *Radio Steel*, the foundation of a reasonable royalty is a hypothetical negotiation occurring at the time of infringement. Gunderson's approach of simply taking a portion of CDP's profits as a "reasonable royalty" bears no relationship to a hypothetical negotiation.

12

Furthermore, Gunderson's arbitrary figure of taking 25% to 33% of CDP's actual profits as a "starting point" and an "ending point" has no basis in law. No where in *Georgia Pacific,* or in any other reported Federal Circuit case known to CDP, has a court endorsed an arbitrary figure selected by an expert (whether based on articles or not) and applying that percentage to the alleged infringer's profits. Instead, *Georgia Pacific* requires that a reasonable royalty rate be determined by application of numerous factors.

Accordingly, because Gunderson's "starting point" and "ending point" of a simple "profit split" is an improper methodology for assessing a reasonable royalty, his testimony should not be permitted.

### 2.   Gunderson's Methodology Concerning the Hypothetical Negotiation is Fundamentally Flawed.

Consistent with the proposition that a reasonable royalty analysis is not an after-the-fact profit split, recent Federal Circuit decisions concerning reasonable royalty calculations underscore that it is based upon a hypothetical negotiation between the patent owner and the alleged infringer at a time before the infringing activity began. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869 (Fed. Cir. 2003) and *Riles, supra,* 298 F.3d at 1311. In *Integra Lifesciences*, the court observed as follows concerning the appropriate approach:

> Thus, the reasonable royalty calculus assesses the relevant market as it would have developed <u>before and absent</u> the infringing activity. Although an exercise in approximation,

13

this analysis must be based on "sound economic and factual predicates". *Integra Lifesciences* at 870. (Emphasis added.)

In undertaking this reasonable royalty analysis, courts have repeatedly stated that the hypothetical negotiation contemplates only those facts, circumstances and expectations of the parties at the time of the hypothetical negotiation. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (the negotiation must be hypothesized as of the time infringement began) and *Wang Labs. Inc. v. Toshiba Corp.*, 993 F.2d 858, 869-870 (Fed. Cir. 1993). As stated in *Riles, supra*, 298 F.3d at 1313, the "reasonable royalty determination . . . must relate to the time infringement occurred and not be an <u>after-the-fact assessment</u>." Accordingly, courts have repeatedly held that expectations of profits at the time of the hypothetical negotiation are much more probative for a reasonable royalty than actual profits. *Interactive Pictures* at 1385 (profit projections are a fair basis for reasonable royalty rather than actual profits) and *Radio Steel, supra*, 788 F.2d at 1557 (same holding).[4]

In *Integra Lifesciences*, the court reversed a reasonable royalty award because it was based on an expert's hypothetical negotiation occurring in 1995 rather than at the time of infringement, one year prior. *Integra Lifesciences* at 870. In particular, the court

---

[4] This is not to say that events subsequent to the hypothetical negotiation cannot be considered. However, those subsequent events are generally admissible only to show what the parties anticipated at the time of the hypothetical negotiations. *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1567 (Fed. Cir. 1984) (evidence of the infringer's actual profits generally is admissible as <u>probative of his anticipated profits</u>).

observed that the parties' expectations of obtaining FDA approval were markedly higher in 1995 than in 1994 and, thus, employing the expectations from 1995 was inappropriate. *Id.*

Gunderson's methodology is flawed for the same reason as that in *Riles*, i.e., Gunderson's analysis is a pure "after-the-fact" analysis. While excluding consideration of Legato's license with Microsoft, Gunderson undertakes no effort whatsoever to distinguish what was known or expected by the parties at the time of the hypothetical negotiation with the (unexpected) success of CDP's products. As he acknowledged, he considered events for his hypothetical negotiation <u>even if they were not foreseeable</u>.

The error of Gunderson's methodology renders his opinions unreliable. As in *Integra Lifesciences*, the expectations of the parties at the time of the hypothetical negotiation were significantly different in 1997 than in 2003, the time frame on which Gunderson bases his reasonable royalty. For example, in 1997, CDP had a fledgling product and operated at significant losses (until 2000). (Report, Tab "6" thereto.) Likewise, Vinca – then the owner of the patents in suit – also operated at a tremendous loss from 1995 – 1997. (Report, Tab 7.)

CDP submits that, notwithstanding the rather ephemeral characteristics of a reasonable royalty analysis, a damage experts must employ a methodology with some fidelity to the law. This Court's gatekeeping function is all the more important because,

as acknowledged in *DSU Medical*, the methodology which Gunderson must employ is one based on law. Accordingly, cross examining Gunderson on his failures to follow applicable Federal Circuit law will be troublesome, at best, in front of a jury. However, whatever the difficulties, the law imposes a burden on damage experts to follow the parameters of a hypothetical negotiation instead of picking a number out of thin air for a reasonable royalty and relying on any events notwithstanding their distance or proximity in time to the hypothetical negotiation in order to substantiate the royalty rate.

3.  **Gunderson's Reference to "Industry" License Agreements Should be Precluded.**

In *Utah Medical, supra*, 350 F.3d at 1385-1386, the Federal Circuit affirmed this Court's exclusion of expert testimony about, *inter alia*, "industry license agreements" because they were not relevant or reliable. In particular, the Federal Circuit held that exclusion of such evidence and testimony was proper because such license agreements were not in any way comparable to the patent in suit and were thus not a reliable means of calculating a reasonable royalty for infringement of the patent. *Id.*

In the present case, Gunderson acknowledged that <u>not one</u> of the license agreements referenced in his report concerns technology which is comparable to the

patents in suit. As such, Gunderson should not be permitted to testify about these unreliable and irrelevant license agreements.[5]

### 4. **Gunderson Should Not be Permitted to Testify About the Acceptability of Non-Infringing Alternatives.**

Gunderson's analysis of whether or not an acceptable non-infringing substitute could have been generated by CDP is way off the mark. As he testified, his analysis was to determine whether a non-infringing substitute was acceptable to CDP as opposed to whether CDP's customers would accept the non-infringing alternative.[6] When evaluating whether a non-infringing substitute is acceptable, the inquiry is whether the non-infringing substitute is acceptable to the consumers. *See, e.g., Fiskars, Inc. v. Hunt Manufacturing Co.*, 279 F.3d 1378, 1382-1383 (Fed. Cir. 2002) (whether a non-infringing alternative is acceptable depends on whether consumers accept the alternative), *Bick Leisure Products, Inc. v. Wind Surfing International, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) (same analysis), *Slimfold Manufacturing Co., Inc. v. Kinkead Industries, Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991) (whether alternative is acceptable depends on whether consumers specifically want a device with the patented features) and *Scripto-Tokai*

---

[5] Also, Gunderson strains credulity in his expert report when he claims that "many" of the license agreements fell within the range of a 10% to 20% royalty rate when, in fact, by his own testimony, the overwhelming majority of such license agreements were not within this range.

[6] As explored in his deposition, Gunderson relies exclusively on CDP's marketing documents extolling the virtues of its method as opposed to the methods of its competitors. However, if one relied exclusively on Porsche's marketing, "there is no substitute," no one would conclude that a Ferrari would be acceptable to a potential Porsche purchaser.

17

*Corporation v. Gillete Co.*, 788 F. Supp. 439, 445 (C. D. Cal. 1992) (acceptability of non-infringing substitute depends on whether consumers would buy substitute).

Gunderson concludes in his report that no acceptable non-infringing alternative could have been generated by CDP. He acknowledged in his deposition that he conducted no inquiry whatsoever concerning what customers in the applicable market wanted and whether they would accept a non-infringing alternative. Accordingly, due to the error in his methodology, Gunderson should not be permitted to testify about the acceptability of a non-infringing alternative from CDP.

## IV.

## CONCLUSION

For the foregoing reasons, CDP's motion *in limine* should be GRANTED

DATED this 27th day of July, 2004.

> MORRIS, MANNING & MARTIN LLP
> and
> BURBIDGE & MITCHELL
>
> By: _____
> Jefferson W. Gross
> Attorneys for Defendant Columbia Data
> Products, Inc.

## **CERTIFICATE OF SERVICE**

On the date below written, the undersigned hereby certifies that a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT COLUMBIA DATA PRODUCTS, INC.'S MOTION *IN LIMINE* TO PRECLUDE OR, IN THE ALTERNATIVE, TO LIMIT LANCE E. GUNDERSON'S TESTIMONY REGARDING REASONABLE ROYALTY DAMAGES** was hand delivered to the following:

    Charles L. Roberts
    WORKMAN NYDEGGER
    1000 Eagle Gate Tower
    60 E. South Temple
    Salt Lake City, Utah   84111

DATED this ____ day of July, 2004.

P:\DKapinos\MyFiles\Columbia Data\Pleadings\MemoLimine.wpd

# Exhibits/Attachments to this document have **not** been scanned.

# Please see the case file.