FILED
CLERK, U.S. DISTRICT COURT

2004 NOV 10 P 12: 26

DISTRICT OF UTAH

BY: _____
DEPUTY CLERK

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| EMC CORPORATION f/k/a LEGATO SYSTEMS, INC., | |
| Plaintiff, | ORDER |
| vs. | |
| COLUMBIA DATA PRODUCTS, INC., | Case No. 2:01 CV 312 TC |
| Defendant. | |

In this patent case, the parties have filed numerous motions in limine. The court

considers each of the motions in turn.

**EMC'S Motions**

1.    <u>Motion to Exclude Opinion Testimony not Timely Disclosed in an Expert Report</u>.

EMC styles this motion as "preemptive," because CDP has not indicated that it intends to

offer any previously undisclosed expert testimony. But EMC is concerned that CDP will, during

trial, attempt to solicit undisclosed expert testimony bearing on CDP's anti-trust counterclaim.

The court will not permit either party to offer undisclosed expert testimony if that

person's testimony falls under Federal Rule of Evidence 702. Accordingly, EMC's motion is

granted.

2.    <u>Motion to Exclude all Evidence of Legato's Alleged Prior Knowledge of SNAP and FreezeFrame</u>.

297

According to EMC, CDP contends that EMC's predecessor, Legato, knew of SNAP and FreezeFrame during the prosecution of the '222 patent but intentionally withheld these references from the PTO.  Therefore, the argument continues, the '222 Patent was obtained by fraud.

EMC believes that such evidence should be excluded because the evidence "comes in the form of testimony from various individuals within the Legato organization who had <u>no involvement with the prosecution of the patents-in-suit and who had no reason to believe that SNAP or FreezeFrame was prior art</u>."  (EMC's Mem. in Supp. at 9 (emphasis in original).)  EMC contends that because these individuals were not involved in the prosecution of the '222 Patent, they owed no duty of candor to the PTO and evidence of their knowledge is not relevant.

CDP responds that, contrary to EMC's claims, those who owed a duty of candor to the PTO knew of the existence of SNAP and FreezeFrame during the prosecution of the '222 Patent. Also, CDP argues that this evidence is relevant on the issue of EMC's alleged attempt to monopolize.

If CDP does attempt to offer such evidence, the court will require CDP to make an initial showing, outside the presence of the jury, that this evidence is indeed relevant.  With this initial showing, CDP must demonstrate that the alleged knowledge of the existence of SNAP and FreezeFrame was conveyed to, or held by, those who did owe a duty of candor to the PTO.

Accordingly, because EMC's motion is premature the court denies it without prejudice. Neither side will refer to this proposed evidence in their openings.

      3.    <u>Motion to Exclude Evidence Comparing the Operation of SNAP and/or FreezeFrame with Legato's Computer Animation.</u>

According to EMC, CDP will offer evidence comparing Legato's illustrative video to SNAP and FreezeFrame. EMC argues that this evidence is irrelevant because to prove invalidity based on anticipation, CDP must prove by clear and convincing evidence that each and every claim of the patents was disclosed by SNAP and/ or FreezeFrame. According to EMC, "Such attempted proof may be made by analyzing the alleged prior art, i.e., SNAP and FreezeFrame, and then attempting to verify that each and every element of the asserted claims is present in the alleged prior art. But a comparison of alleged prior art with a mere demonstrative animation is probative of nothing." (EMC's Mem. in Supp. at 14 (citations omitted).)

Although the court tends to agree with EMC, the court will reserve final ruling on this issue until time of trial, after CDP has laid the foundation it believes is sufficient for the admission of this exhibit.

Accordingly, because EMC's motion is premature the court denies it without prejudice. Neither side will refer to this proposed evidence in their openings.

4.    Motion to Bar all Non-Party Witnesses under Rule 615 from Attendance during the Trial until They are Called to Testify.

This motion is granted with certain exceptions. All witnesses, other than one representative of each party, will remain outside the courtroom until called upon to testify. No witness will discuss, until the jury has returned its verdict, her or his testimony with any other witness. No witness will read any transcripts or notes of the proceedings.

Once examination of a witness has begun, no attorney may discuss the substance of that witness' testimony with her or him.

3

Experts will not be excluded from the courtroom unless the party seeking exclusion satisfies the court that the expert should not be present during a certain witnesses testimony. Absent such a showing, experts may remain in the courtroom throughout trial.

     5.     <u>Motion to Exclude all Evidence Going to CDP's Tax Argument</u>.

EMC contends that CDP plans to offer evidence relating to an alleged "tax problem" of EMC's predecessor, Legato. EMC argues that this evidence has no probative value. CDP agrees that this evidence is not relevant. Accordingly, the court grants the motion.

     6. <u>Motion to Exclude all Evidence of Alleged Relevant Market and Market Power</u>

EMC contends that only an expert is qualified to testify on the issues of relevant market or market power. Because CDP has not designated an expert in these areas, EMC argues that CDP is precluded from offering evidence on this subject.

CDP maintains that EMC relies on an Eleventh Circuit case, <u>Bailey v. Allgass, Inc.</u>, 284 F.3d 1237 (11th Cir. 2002), for its argument that only experts may provide testimony about the relevant market and market power, and that the Tenth Circuit has not adopted this rule . CDP points out that this court, in <u>Lantec, Inc. v. Novell, Inc.</u>, 146 F. Supp. 2d 1140 (D. Utah 2001), declined to adopt the <u>Bailey</u> rule, and that Tenth Circuit likewise declined to do so. <u>Lantec, Inc. v. Novell, Inc.</u>, 306 F.3d 1003, 1024-27 (10th Cir. 2002).

In the absence of a controlling decision from the Tenth Circuit adopting the <u>Bailey</u> rule, the court rejects the <u>Bailey</u> rule that only an expert is qualified to testify on the issues of relevant market or market power. Accordingly, the motion is denied and lay witness testimony on this point will be accepted. The court, however, will not allow the admission of expert testimony

4

under the guise that it is lay witness testimony.

      7.     <u>Motion to Exclude Clegg Ivey as a Witness</u>.

EMC argues that CDP plans to solicit expert anti-trust testimony from Mr. Ivey. The court would not permit such testimony. EMC has also asked that the court prohibit Mr. Ivey from testifying at all in this case.

Apparently agreeing (through its silence) that Mr. Ivey cannot testify as an expert witness, CDP argues that there is no factual or legal basis to exclude Mr. Ivey from testifying as a fact witness. The court agrees with CDP, and Mr. Ivey will be permitted to testify as a fact witness. Again, the court cautions the parties that it will not allow expert testimony to come in through a fact witness.

      8.     <u>Motion to Preclude CDP from Arguing Invalidity Based on References not disclosed in Accordance with 35 U.S.C. § 282</u>.

EMC moves the court for an order that CDP be barred from arguing invalidity based on any references not disclosed in accordance with 35 U.S.C. § 282. CDP does not contest this motion. Accordingly, the motion is granted.

      9.     <u>Motion to Preclude CDP from Relying on any Opinion as a Defense to Willful Infringement</u>.

CDP stipulated that it was precluded from offering two attorney opinions because it had failed to timely disclose them. According to EMC, it believes that CDP will, despite its stipulation and the related order, attempt to offer evidence of these opinions (or other opinions by counsel). EMC has asked that CDP be barred from offering any such evidence. CDP argues that such a blanket rule is not necessary.

Because of the stipulation, the court need not address the two opinions at issue. Should CDP attempt to offer attorney opinions, or evidence of attorney opinions at trial, the court will address EMC's motion at that time.

Accordingly, because EMC's motion is premature the court denies it without prejudice. Neither side will refer to this proposed evidence in their openings.

10.  Motion for Reconsideration of the Order Granting in Part EMC's Motion to Strike the "Supplemental Report on Invalidity" and Accompanying Statutory Declaration of Larry Ruane.

On August 17, 2004, EMC filed a motion to strike the supplemental expert report on invalidity by CDP's expert, Dr. Muntz, and the accompanying declaration of Mr. Ruane. CDP served the report and declaration the preceding day, August 16, 2004. On August 19, 2004, the court granted the motion to strike both the report and declaration, but ordered that Dr. Muntz and Mr. Ruane would be allowed to testify at trial regarding the operability and functionality of SNAP and/or FreezeFrame.

EMC now asks the court to reconsider its decision. Specifically, EMC asks that Dr. Muntz and Mr. Ruane be precluded from testifying at trial regarding the operability and functionality of SNAP and/or FreezeFrame.

After reviewing the parties' briefs, the court finds that EMC's motion to reconsider has some merit. Dr. Muntz's supplemental expert report was served well after the close of expert discovery, and Dr. Muntz will be precluded from testifying at trial regarding the operability and functionality of SNAP and/or FreezeFrame. Dr. Muntz will presumably testify on other matters, and EMC will be allowed to cross examine him. If on cross examination, however, EMC asks

6

Dr. Muntz questions regarding whether he has operated SNAP or FreezeFrame, the court will reconsider this ruling.

As for Mr. Ruane, the court finds that as a fact witness, he will be allowed to testify about his own operation of the version of SNAP at issue. EMC will be allowed to cross examine Mr. Ruane on this subject. Accordingly, EMC's motion is granted-in-part and denied-in-part.

11.    Motion for Entry of Judgment on CDP's Admitted Infringement of Claim 3 of the '222 Patent.

EMC argues that, as a result of the court's August 13, 2004 Order and CDP's response to one of EMC's requests for admission, the court enter judgment that CDP infringes claim 3 of the '222 Patent. The court, however, will not enter judgment at this time. Many other matters have yet to be resolved in this case, including several pertaining to the invalidity and infringement of both the '152 and '222 Patents. Accordingly, EMC's motion is denied.

**CDP's Motions**

1.    Motion Regarding Infringement of the '152 Patent by OTM.

With this motion, CDP seeks (1) an order that OTM does not infringe any claim of the '152 Patent, and (2) an order precluding EMC from arguing or offering evidence that OTM infringes the '152 Patent under the doctrine of equivalents.

First, CDP argues that the court's August 13, 2004 Order, which found that OTM did not meet the "if and only if" limitation of claim 1 of the '152 Patent, mandates that the court find OTM does not literally infringe any claims of the '152 Patent. EMC does not address this issue in its opposition to CDP's motion.

7

CDP is correct. All of the asserted independent claims of the '152 Patent contain the "if and only if" limitation, and for the reasons set forth in the court's August 13, 2004 Order, OTM does not meet this limitation. Further, because a party cannot infringe a dependent claim when it does not infringe the underlying independent claim, Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 626 (Fed. Cir. 1985), OTM does not infringe the asserted dependent claims. Accordingly, CDP's motion is granted on this point.

Second, CDP also argues that EMC should be precluded from offering any evidence that OTM infringes the '152 Patent under the doctrine of equivalents. EMC responds that it should be allowed to present evidence to the jury supporting infringement by OTM of the '152 Patent under the doctrine of equivalents.

CDP is correct that EMC has not previously raised infringement of the '152 Patent by OTM under the doctrine of equivalents. Accordingly, EMC will not be allowed to offer any evidence or argue that OTM infringes the '152 Patent under the doctrine of equivalents, and CDP's motion is granted on this point also.[1]

2.  Motion Regarding Whether SNAP and/or FreezeFrame Contain All of the Elements of the Patents.

CDP contends that EMC intends to argue that SNAP and/or FreezeFrame do not contain all of the elements of the Patents. CDP argues that the court's August 13, 2004 Order precludes EMC from making this argument because the court found that CDP had established SNAP and

---

[1]EMC did assert that PSM infringes the '152 Patent under the doctrine of equivalents, and EMC will be allowed to argue and present evidence on this question. Accordingly, to the extent CDP's motion sought to preclude this evidence as well, the motion is denied.

FreezeFrame do contain all of the elements of the Patents. EMC argues that CDP did not move for summary judgment on whether SNAP and/or FreezeFrame do not contain all of the elements of the Patents, and therefore the court's August 13, 2004 Order did not grant summary judgment for CDP on this point. In opposing CDP's invalidity motion, EMC argues that to defeat it, EMC only had to raise a general issue of material fact, either as to whether the alleged prior art is indeed prior art, or whether the alleged prior art contains all of the elements of the Patents.

The court agrees with EMC. CDP moved for summary judgment seeking an order that the Patents were invalid. CDP did not ask the court for an order that the first identity requirement—whether the alleged prior art contains all of the elements of the Patents—was satisfied. Although in the court's August 13, 2004 Order, the court found that EMC had not raised a genuine issue of material fact regarding the first identity requirement, the court found that EMC did raise a genuine issue of material fact regarding the second identity requirement—whether the alleged prior art was indeed prior art. As a result, the court denied CDP's motion for summary judgment. Accordingly, CDP's motion in limine is denied.

3.    Motion Regarding Market Share and Purported Intentional Interference Claim.

CDP asks the court to bar EMC from presenting any evidence pertaining to the market share of Legato products which utilize the technology of the '152 Patent and '222 Patents. CDP also seeks an order precluding EMC from offering evidence on its claim that CDP pilfered information, including trade secrets. CDP bases this motion on its contention that EMC has not complied with its discovery obligations because it did not supplement interrogatory answers or produce witnesses competent to testify on certain topics.

9

EMC notes that CDP failed to file any motions to compel during the discovery period. EMC also argues that it offered to make individuals available to CDP for deposition to correct any deficiencies in discovery, but CDP declined to accept this offer.

The court agrees with EMC. As to any deficiencies in discovery responses, the court notes that the responses to which CDP objects were served on October 15, 2001. CDP has had nearly three years to bring any deficiencies to the court's attention. The court will not address CDP's complaints at this late date.

As to CDP's contention that EMC's Rule 30(b)(6) witness was not adequately prepared to testify, CDP has not met its burden to show that any failure on the part of EMC was willful or egregious. Patterson v. C.I.T. Corp., 352 F.2d 333, 336 (10th Cir. 1965); The Bank of N.Y. v. Meridien Biao Bank Tanz. Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997). On March 19, 2004, less than two weeks before the close of fact discovery, CDP served its second notice to EMC of its intention to take EMC's deposition under Federal Rule of Civil Procedure 30(b)(6). CDP included 43 areas about which it sought testimony from EMC. EMC designated Mr. James Chappel as its Rule 30(b)(6) witness, and the deposition took place on March 31, 2004, twelve days after it was noticed. Of the 43 areas of testimony, CDP only challenges Mr. Chappell's ability to testify on two—numbers 33 and 43. CDP is correct that Mr. Chappell did not adequately testify as to these two areas. As to number 33, however, Mr. Chappell did identify two persons that would be able to testify, but CDP did not request that they be produced for depositions. Again, as to area 43, EMC offered to provide persons able to testify, but CDP did not accept this offer. Given the short time frame CDP gave EMC to prepare for a Rule 30(b)(6)

depositions and the accommodations EMC was willing to make on further depositions, CDP has failed to show EMC's conduct was egregious or willful.  Accordingly, CDP's motion is denied.

      4.     <u>Motion Regarding Communications between EMC's Counsel and Larry Ruane</u>.

Larry Ruane is the inventor of SNAP.  CDP seeks to bar any communications between Mr. Ruane and counsel for EMC.  CDP further argues that an email dated August 18,2004, should be barred.  According to CDP, precluding this evidence is appropriate because EMC failed to timely disclose it.

CDP's various arguments are not persuasive.  Mr. Ruane is not represented by counsel for either side.  In addition, EMC disclosed the email two days after it was created.  And finally, the email is not unduly confusing.  Any confusion that results from the receipt of the email can be addressed by counsel through their witnesses.  Accordingly, CDP's motion is denied.

      5.     <u>Motion for Summary Judgment on Obviousness</u>.

CDP argues that in its invalidity motion (docket number 254) it moved for summary judgment that SNAP and FreezeFrame render the Patents obvious, and that this motion should be granted because EMC failed to respond.  CDP did indeed mention obviousness in its invalidity brief.  CDP's two lines of analysis supporting its obviousness argument, however, do not satisfy its initial burden of demonstrating that there is an absence of evidence to support EMC's case.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  When the court construes all facts and reasonable inferences in the light most favorable to EMC, as it must, <u>see</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Pueblo of Santa Ana v. Kelly</u>, 104 F.3d 1546, 1552 (10th Cir. 1997), CDP's mere citation to its expert's opinion, with nothing more, fails

11

to demonstrate that summary judgment is appropriate.  Moreover, to the extent CDP's two lines

of analysis did satisfy its burden, CDP's obviousness argument fails for the same reason as did its

anticipation arguments—it has failed to show that SNAP and FreezeFrame were prior art to the

Patents.  Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1568 (Fed. Cir. 1987).  CDP's

motion is denied without prejudice.

      6.     Motion to Preclude Testimony of Richard H. Johnson.

On April 2, 2004, the parties were required to submit expert reports on those issues

where they had the burden of proof.  On April 16, 2004, rebuttal expert reports were due.  CDP

contends that Mr. Johnson should not be permitted to testify at trial because EMC failed to

timely submit his expert report.  EMC replies that Mr. Johnson is a rebuttal witness because the

subject of his proposed testimony is the tax consequences of the Vinca/Sundance acquisition.

According to EMC, Mr. Johnson's testimony will be offered to rebut CDP's claim that Legato

engaged in fraudulent conduct as regards that merger.

In view of CDP's agreement (see above) that it will not raise the tax merger issue, this

motion is denied as moot.

**The Daubert Motions**

Citing Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 579 (1993), the parties ask the court to preclude (or, in some cases, limit), the testimony

of certain experts.  The parties do not challenge the qualifications of these experts; rather, they

contend that the methods used by the experts render their opinions unreliable.

      1.     CDP's Motion to Preclude or, in the Alternative, to Limit Lance E. Gunderson's

<u>Testimony Regarding Reasonable Royalty Damages.</u>

Mr. Lance Gunderson, EMC's damage expert, expressed his opinion that:

> [T]he appropriate reasonable royalty rate is 12% to 15%. Applying this royalty rate to CDP sales of infringing products from July 1997 (the date the '152 patent issued) through December 2003 results in damages of approximately $3.2 million to $4.0 million for sales containing the OTM technology and $176 thousand to $220 thousand for sales containing the PSM technology. Total royalties for OTM and PSM range from approximately $3.4 million to $4.3 million.

(EMC's Combined Mem. in Opp. and Supp., Ex. A, April 2, 2004 Expert Report of Lance E.

Gunderson, ( "April 2004 Gunderson. Rep.").)

In his report, Mr. Gunderson gives a lengthy analysis of how he arrived at the above

conclusion. Although Mr. Gunderson discusses the factors from <u>Georgia-Pacific v. U.S.</u>

<u>Plywood</u>, 318 F.Supp. 1116 (S.D.N.Y. 1970), he made clear, both in his report and in his

testimony at the hearing on these motions, that the starting point and the ending point of his

analysis was a 25% to 33% split of profits. (April 2004 Gunderson Rep. at 12 and 15). CDP

characterizes this method as "Gunderson's Rule of Thumb" and argues that this method, in itself,

is not reliable. (CDP's Rep. Mem. at 3.) Further, CDP challenges Mr. Gunderson's use of

CDP's actual profit margin from 1997 to 2003.

EMC responds that "'[t]he Rule of Thumb' is a widely used convention in calculating

reasonable royalty damages in which a starting point for the rate is set by using a profit split so

that a certain percentage of the profits made by the licensee (i.e, the infringer) are paid to the

licensor." (EMC's Combined Mem. in Opp. and Supp. at 7.) The record establishes that this

method is generally accepted by damage experts in placing a value on intellectual property. (<u>See</u>

13

Defendant's Hearing Exhibits 1 and 3 from the September 3 and 7, 2004 Hearing.)

While CDP is correct that a reasonable royalty rate should be established as of the date just before the infringer begins to infringe, evidence of actual profits can also be relevant. 7 Donald S. Chisum, Chisum on Patents, § 20.03[3][b][iv] (2000) ("The courts often consider the infringer's actual profit performance over the period of infringement as pertinent evidence.").

CDP argues that Mr. Gunderson should be barred from testifying about other license agreements in the software area. Mr. Gunderson noted in his report that "the publicly available licenses [in the software industry] I reviewed vary widely from as high as 65% to less than 1%." (April 2004 Gunderson Report 11). Because this factor was simply one in the many he considered, the court will permit this testimony.

Finally, CDP challenges Mr. Gunderson's conclusion that "he is unaware of any available acceptable and non-infringing alternatives to the patented technology." (April 2004 Gunderson Rep. at 21.) But, as EMC points out, there is an evidentiary basis for Mr. Gunderson's belief. Accordingly, Mr. Gunderson will be permitted to testify on this issue.

For the above reasons, the court denies CDP's motion. The alleged flaws in Mr. Gunderson's opinions pointed to by CDP do not render that testimony so unreliable as to be inadmissible under Rule 702. CDP will have the opportunity on cross-examination to explore these areas with Mr. Gunderson.

2.      EMC's Motion to Preclude the Testimony of Richard Muntz Regarding the
        Operability and/or Functionality of SNAP and FreezeFrame.[2]

---

[2]In this order, the court has decided that Dr. Muntz will not be allowed to testify regarding his operation of these programs which occurred after the discovery deadline.

Dr. Muntz has given an opinion that SNAP and Freeze anticipate or render obvious all the claims of the '152 and '222 Patents. Dr. Muntz formed this opinion after having reviewed the SNAP product code and FreezeFrame Users Guides. At the time he arrived at his initial opinion, Dr. Muntz had not compiled nor run either of the two programs. At his deposition, Dr. Muntz testified that "You won't know whether it's [code] going to work as represented until you actually compile and run it." (CDP's Mem. in Opp. at 2 (quoting Muntz Deposition Testimony).)

Based on this statement by Dr. Muntz, EMC argues that Dr. Muntz should not be allowed to testify regarding whether Snap or FreezeFrame is operable or can function. Dr. Muntz explained at the hearing that through his review of the written materials he had, he was able to reach a conclusion that the two programs would operate generally as intended. Dr. Muntz acknowledged that through a visual review of the programs alone, one could not be certain that a small error or "bug", which would prevent the program from running, had gone undetected. But, according to Dr. Muntz, these errors would be minor and easily corrected. Accordingly, Dr. Muntz may testify as to whether SNAP or FreezeFrame would run or operate generally as intended, assuming that small programming errors or bugs were eliminated.

EMC also challenged the reliability of Dr. Muntz's testimony on the ground that the documents he reviewed could have been altered. (This goes to EMC's contention that there is no valid or credible evidence that SNAP or FreezeFrame is prior art.) However, as the court made clear at the hearing, Dr. Muntz cannot establish that either Snap or FreezeFrame is prior art. Accordingly, Dr. Muntz may testify that the materials he examined were represented to him as

15

having been in existence before April or May 1994. CDP must present sufficient foundation

evidence that the documents Dr. Muntz examined represent SNAP and/or FreezeFrame as they

existed before April or May 1994.

      3.      <u>EMC's Motion to Preclude Richard S. Hoffman from Testifying at Trial and to
Preclude the Admission of his Two Expert Reports into Evidence at Trial.</u>

Mr. Hoffman has submitted two expert reports. In his April 1, 2004 report, he gives an

opinion regarding the amount of damages allegedly suffered by CDP as a result of the May 3,

2001 press release issued by EMC. (EMC's Combined Mem. in Opp. and Supp., Ex. B ("April

1, 2004 Hoffman Rep.").) In his April 16, 2004 report, Mr. Hoffman gives an opinion on EMC's

claim of reasonable royalty damages. (EMC's Combined Mem. in Opp. and Supp., Ex. C ("April

16, 2004 Hoffman Rep."))

      a.      <u>CDP's Damage Claim.</u>

CDP contends that the press release caused it to lose its business relationships with

Veritas, Bakbone and Microsoft. Mr. Hoffman concludes that CDP suffered lost profits of

$18,092,000 from the loss of Veritas business, between $575,674 and $1,183,132 from the loss

of the Bakbone business, and $36,400,000 from the loss of the Microsoft relationship. EMC

seeks to preclude Mr. Hoffman from giving an opinion about the Microsoft damages.

EMC contends that although Mr. Hoffman states that he used the "market valuation

approach" in figuring the damages CDP suffered from losing the Microsoft relationship, Mr.

Hoffman's analysis was flawed because he did not base his opinion on sufficient data. The first

error in Mr. Hoffman's method, according to EMC, was Mr. Hoffman's use of only one

company, Legato, as a "comparative" firm to CDP. EMC points out the differences between

Legato and CDP in size, revenue, assets, growth, liquidity, leverage, and profitablity.  EMC

contends that the second problem with Mr. Hoffman's analysis is that he failed to consider the

differences between the CDP/Microsoft relationship and the Legato/Microsoft relationship.

The court finds that there are clear differences between Legato and CDP.  "Legato was a

publicly held company with yearly revenue in the $300 to $400 million range, several hundred

employees, and a market capitalization of roughly 1 billion."  (EMC's Comb. Mem. in Opp. and

Supp. at 15.)  In contrast, "CDP was a privately held company with yearly revenue barely in the

$7 to $9 million range and no more than ten to thirty total employees." (Id. At 15-16.)  These

differences demonstrate that Legato (EMC) and CDP are not comparable, and Mr. Hoffman erred

in considering them as such.   See Lifewise Master funding v. Telebank, 374 F.3d 917, 929 (10th

Cir. 2004) (affirming trial court's ruling that damage testimony was not admissible partly

because it was not based on "comparable setting" ).

Finally, and most troubling to the court, is Mr. Hoffman's reliance on a single event, the

rise in Legato's stock price on March 11, 2002, in arriving at his opinion.  Mr. Hoffman noted

that the price of Legato's stock went up $0.40 the day after Legato announced its relationship

with Microsoft.  But Mr. Hoffman failed to exclude any other event that could cause this change.

For example, Mr. Hoffman failed to rule out the possibility that the rise was the result of securing

new business from other customers, a product announcement, a business announcement, or

merely a normal fluctuation in Legato's day-to-day stock price.  In sum, Mr. Hoffman erred

because he failed to establish that the announcement by Legato of the relationship was the cause

17

of the rise.  See Claar v. Burlington Northern R.R., 29 F.3d 499, 502 (9th Cir. 1994) (affirming

district ruling that expert testimony was not admissible because the experts failed to establish a

causal link between the evidence and their conclusions).  Further, CDP failed to show that Mr.

Hoffman had ever used a method like this before, or that it was subject to any kind of testing or

accepted in the field.  See Lifewise, 374 F.3d at 929 (affirming trial court's ruling that damage

testimony was not admissible partly because it was not "based on any recognized standard[,]"

"was not peer reviewed," "had no uniform usage[,]" and was "capable of minpulation.").

Accordingly, the court grants EMC's motion on this point and excludes Mr. Hoffman's

testimony, and the applicable portion of his expert reports, addressing CDP's alleged loss of

business.

            b.  EMC's Damage Claim.

EMC contends that Mr. Hoffman's method of calculating EMC's claimed reasonable

royalty damages suffers from three defects:  (1) failure to consider the factors from Georgia-

Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D. N.Y. 1970), factors; (2)

Reliance on a report by a CDP employee; and (3) misapplication of the "Rule of Thumb."  CDP

counters:  (1) even if Mr. Hoffman did not cite the Georgia-Pacific factors, he properly

considered them; (2) it is proper to rely on information provided by one's client; and (3) Mr.

Hoffman properly accounted for the value the patented process adds to the allegedly infringing

products.

The court agrees with CDP.  Looking at EMC's first contention—that Mr. Hoffman did

not consider the Georgia-Pacific Factors—it is clear that Mr. Hoffman did consider these factors,

18

even if he did not expressly include an analysis of them in his report. In his deposition, Mr. Hoffman stated that he did consider the <u>Georgia-Pacific</u> Factors, and discussed several of the factors at some length. (Hoffman Depo. at 130-34, 141-60.)

As to EMC's second contention—that Mr. Hoffman improperly relied on the report of Lou Witt, a CDP employee, about CDP's ability to produce a non-infringing alternative acceptable to Veritas, a CDP customer—Mr. Hoffman did not err by relying on Mr. Witt's report. EMC criticize's Mr. Hoffman's use of the report because it only evaluated the acceptance of the non-infringing alternative to one customer, Veritas. EMC's argument, however, carries little weight because Veritas accounted for more than 80% of CDP's business. (CDP's Mem. in Opp.., Ex. F at 1.) Certainly it was reasonable for CDP to gauge if its major customer would be satisfied with the alternative, and to assume that if it was satisfied, others would be as well.

Lastly, as to EMC's third contention—that Mr. Hoffman improperly applied the Rule of Thumb—EMC has failed to show that Mr. Hoffman's methodology is fatally flawed. On the contrary, Mr. Hoffman's analysis that accounts for the value contributed by the intellectual property to the overall value of the product. This methodology is supported both by <u>Georgia-Pacific,</u> and the work of a leading author and expert in the application of the Rule of Thumb. <u>Georgia-Pacific,</u> 318 F. Supp. at 1120 (One should consider the following factors: "13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."); EMC's Mem. in Supp. and Opp., Ex. H, Robert Goldscheider, et al., <u>Use of the 25 Per Cent Rule in Valuing IP,</u> Les Nouvelles 123, 132 (Dec.

2002) ("[I[t has been asserted that the Rule is inappropriate to use in those instances in which the IP ast issue represents a small fraction of the value of the product. ...  The precise split should be adjusted up or down depending on a host of factors, including the relative contribution of the IP at issue.").

Accordingly, the court denies EMC's motion on this point and declines to exclude Mr. Hoffman's testimony or expert reports regarding EMC's damage claim.

DATED this **10** day of November, 2004.

BY THE COURT:

TENA CAMPBELL
United States District Judge

20

United States District Court
for the
District of Utah
November 10, 2004


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:01-cv-00312


True and correct copies of the attached were either mailed, faxed or e-mailed
by the clerk to the following:


        Ms. Patricia W. Christensen, Esq.
        PARR WADDOUPS BROWN GEE & LOVELESS
        185 S STATE ST STE 1300
        PO BOX 11019
        SALT LAKE CITY, UT  84147
        EMAIL

        Bryan G. Harrison, Esq.
        MORRIS MANNING & MARTIN
        1600 ATLANTA FINANCIAL CTR
        3343 PEACHTREE RD NE
        ATLANTA, GA  30326-1044
        EMAIL

        Mr. Richard D Burbidge, Esq.
        BURBIDGE & MITCHELL
        215 S ST ST STE 920
        SALT LAKE CITY, UT  84111
        EMAIL

        Chad D. Tillman, Esq.
        TILLMAN IVSAN PLLC
        PO BOX 471581
        CHARLOTTE, NC  28247
        EMAIL

        Mr. Larry R Laycock, Esq.
        WORKMAN NYDEGGER
        1000 EAGLE GATE TOWER
        60 E S TEMPLE
        SALT LAKE CITY, UT  84111
        EMAIL